UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

        Plaintiff,                        Criminal No:  14-20303

v.                                      Hon. John Corbett O'Meara

DEVIN EDWARD SMITH,

        Defendant.
_____/

**ORDER DENYING DEFENDANT'S
MOTIONS TO SUPPRESS (Docket No. 12 and 13)**

On July 3, 2014, Defendant filed two motions: 1) a motion to suppress evidence recovered from a vehicle (Docket No. 12), and 2) a motion to suppress evidence recovered from two hotel rooms (Docket No. 13). On September 4, 2014, an evidentiary hearing was held on both motions. The government presented the testimony of four witnesses from the Southfield Police Department: Sergeant Paul Bourlier, Officer Nick Smiscik, Officer Max Lenhard, and Officer Tracey Krettlin. In addition to the testimony of the witnesses, the Court has considered and reviewed the police reports that were submitted as exhibits to the parties' briefs. For the reasons set forth below, Defendants motions are denied.

1

## FINDINGS OF FACT

Sgt Bourlier was working on patrol on April 6, 2014. (Motion Hearing Transcript, September 4, 2014 ("Tr."), p. 12.) On this day, he was aware that in March 2014, a woman was taken at gunpoint from a hotel room in the Marvin's Gardens hotel in Southfield by a heavy set black male with dreadlocks. (Tr. 11.) The woman was a young white woman named B------, and she was only wearing underwear when she was taken from the room. (Tr. 11, 15-16.)

On April 6, 2014, as Sgt Bourlier drove through the parking lot of the Marvin's Gardens, a woman ("A.S.") approached his patrol car. (Tr. 12.) The woman asked him for help, and told Sgt Bourlier she was afraid to talk where she could been seen. (Tr. 13.) Sgt Bourlier drove his vehicle to another part of the parking lot and spoke with A.S. (Tr. 13-14.)

A.S. told Sgt Bourlier that she was staying at the Marvin's Gardens and working as a prostitute for a pimp that she knew as "D." (Tr. 14.) A.S. stated that she wanted to leave, but that she was afraid her pimp would not let her. (Tr. 15.) She described "D" as a black male with a heavy build and dreadlocks. (*Id.*) A.S. identified another woman who worked for "D" as B-----[1], a white female. (*Id.*) A.S. stated that the night before, she observed "D" beat B----- with his fists. (Tr. 17.) Sgt Bourlier concluded that "D" could be the man responsible for taking B----- at

---

[1] The first name provided by A.S. was the same first name of the victim taken at gunpoint on March 13, 2014. This name was identified on the record by Sgt Bourlier during the hearing, but it is not used in this order to protect the privacy of the witness.

2

gunpoint the previous month. (Tr. 15.) A.S. stated that "D" had an associate who was a bald, black male. (Tr. 15.) A.S. said that she had seen "D" with a handgun and a stun gun, and that the day before she saw "D" use his stun gun on a man she knew as "Mikey" approximately 20 times while Mikey cried and covered his face. (Tr. 18, 19.)

    Sgt Bourlier used his police radio and requested that other patrol cars respond to the Red Roof Inn and begin looking for "D" and B------. (Tr. 20.) Sgt Bourlier gave the officers a description of "D" and said that he could be armed with a gun or electric stun gun. (Tr. 20.) Officers Smiscik, Karinen, and Krettlin responded. (*Id.*)

    When Officer Smiscik drove to the rear of the Red Roof Inn, he saw Defendant standing the parking lot. (Tr. 41.) Defendant was walking away from a vehicle and walking towards the hotel. (*Id.*) Officer Smiscik called Defendant over to his police car. (*Id.*) Officer Smiscik asked Defendant for his identification and his name. (Tr. 43.) Defendant did not have any identification, and he provided a false name. (Tr. 43-44.) Once Officer Smiscik determined that the name Defendant had provided was incorrect, he asked for his name again, and again Defendant provided a false name. (Tr. 44.) Finally, Defendant provided his true identity to the officers. (Tr. 45.) A decision was made to arrest Defendant, and the officers searched him. (Tr. 45.) In Defendant's pockets, officers recovered over $2,000,

two Red Roof Inn hotel keys, room receipts, and identification belonging to Michael Peavey. (Tr. 45-46, 57-58.) Sgt Bourlier showed A.S. a picture of Defendant, and she confirmed that Defendant was the man she knew as "D." (Tr. 21-22.)

A.S. told Sgt Bourlier that Defendant drove a small, red SUV. (Tr. 18.) After Defendant's arrest, officers located a red Chevy Captiva in the parking lot of the Red Roof Inn, near where Defendant had been apprehended. Officer Bourlier described the vehicle in the parking lot to A.S., and she confirmed that that was the vehicle she knew Defendant to drive. (Tr. 22.)

When Officer Krettlin responded to the Red Roof Inn, he walked up to Defendant's car. (Tr. 71.) Officer Krettlin "looked in the window" and "saw a taser in the middle console." (*Id.*) The stun gun was in plain sight. Officer Krettlin then opened the car door and searched the vehicle. (Tr. 74.) In addition to the stun gun, the search of the car recovered cell phones throughout the vehicle. (*Id.*) A total of seven cell phones were found in the car. (Southfield Police Report, Docket No. 20-3, p. 17, Pg ID 123.)

While Defendant was being arrested, a woman came out of a Red Roof Inn hotel room and began speaking to Defendant. (Tr. 60.) From the parking lot, Defendant shouted up to the balcony and tried to give the woman names and phone numbers to call. (*Id.*) Officer Lenhard went up the stairs to speak with this woman

4

to ascertain if she was a victim or a suspect. (*Id*.) The woman was not cooperative with Officer Lenhard, and he was unable to determine what role she played in Defendant's suspected sex trafficking. (Tr. 61.)

Officers Krettlin and Lenhard entered the hotel rooms corresponding to the keys recovered from Defendant's pocket (rooms 203 and 205). (Tr. 62.) The officers entered the rooms looking for victims. (Tr. 25, 62.) Sgt Bourlier testified that he "was very concerned for [B----'s] safety." (Tr. 25.) Officer Lenhard said that "we were concerned that there may be other victims of any sort of assault and/or prostitution, underage victims. We wanted to get there and satisfy that there was no other injuries or anybody in duress." (Tr. 62.)

Officers knocked on the door of Room 203, and identified themselves as police. (Tr. 63.) When they received no response, they opened the door. (*Id*.) Inside, they found found B------. (*Id.*) Officers also saw two cell phones in plain view, which were seized. (Tr. 63, 64; Docket No. 20-3, p. 16, Pg ID 122.) No one was present in Room 205, but three cell phones were in plain view. (*Id.*) These phones were also seized.

## CONCLUSIONS OF LAW

### A. Car search

Police may search an automobile without a search warrant when they have probable cause to believe it contains contraband or evidence of criminal activity.

*United States v. Galaviz*, 645 F.3d 347, 355 (citing *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)).

Here, the officers had probable cause to believe that Defendant's car contained evidence of sex trafficking and assault. Probable cause was based on information provided by A.S. and corroborated by Defendant's arrest. In addition, when Officer Krettlin approached Defendant's car, he saw a stun gun in the middle of the front seat.

### B. Search of hotel rooms

Law enforcement may enter a private residence, including a hotel room, without a warrant if "'probable cause plus exigent circumstances' exist." *United States v. McClain*, 444 F.3d 556, 561 (6th Cir. 2006), *quoting Kirk v. Louisiana*, 536 U.S. 635, 638 (2002). The Sixth Circuit has held that warrantless entries may be justified if there is a risk of danger to the police or others. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir.1996); *United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002); *United States v. Purcell*, 526 F.3d 953, 960 (2008). Police "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Officers "do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45 (2009). "Nor do officers need to wait for a potentially

dangerous situation to escalate into public violence in order to intervene." *Johnson v. City of Memphis*, 617 F. 3d 864, 868 (6th Cir. 2010). "[T]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to causalities." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009). To be justified, the police's entry must be based on an objectively reasonable belief, given the information available at the time of entry, that a person within the location was "in need of immediate aid." *Mincey*, 437 U.S. 385, 392 (1978).

In this case, law enforcement had strong evidence that Defendant was operating a violent prostitution ring. Officers knew that in March, B---- was taken at gunpoint from a hotel room by a man matching Defendant's description. A.S. told Sgt Bourlier that Defendant was violent, that she had seen him beat B----- with his fists, and that she had witnessed him use a stun gun on Mikey. At his arrest, Defendant gave false names to the police. He had over $2,000 in his pocket, along with identification for Michael Peavey and two hotel keys. A stun gun was recovered from Defendant's car. As a result, the police had an objectively reasonable belief that Rooms 203 and 205 contained more victims of Defendant's suspected sex trafficking, and that these victims needed help from law enforcement. The entry into the hotel rooms was justified by exigent circumstances. Once the officers entered the rooms, they saw cell phones in plain view and the seizure of those items was permissible.

7

Defendant's motions are denied.

IT IS SO ORDERED.

Date: September 18, 2014      s/John Corbett O'Meara
                              United States District Judge


I hereby certify that on September 18, 2014 a copy of this order was served upon counsel of record using the ECF system.

                              s/William Barkholz
                              Case Manager

8